# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| USA ENVIRONMENT, L.P. and | § | |
| BAYOU CITY ENVIRONMENTAL | § | |
| SERVICES, L.P., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CASE NO. 4:16-cv-2216 |
| | § | |
| AMERICAN INTERNATIONAL | § | |
| SPECIALTY LINES INSURANCE CO. | § | |
| n/k/a AIG SPECIALTY INSURANCE | § | |
| CO., | § | |
| Defendant. | § | |

# <u>MEMORANDUM AND ORDER</u>

## <u>TABLE OF CONTENTS</u>

I.   Introduction .................................................................................................2

II.  Factual Background ......................................................................................3

    A.   The Underlying Lawsuit......................................................................3

    B.   Procedural Posture..............................................................................9

III. Legal Standards............................................................................................11

    A.   Summary Judgment...........................................................................11

    B.   Legal Principles for Interpretation of Insurance Contracts and
        Assessment of the Duty to Defend....................................................12

IV.  Analysis........................................................................................................15

    A.   The 2011 Policy.................................................................................17

        1.   Paragraph 6 of the Pollution Exclusion ...................................17

        2.   Progressive, Indivisible Property Damage … Caused By
            Related or Continuous Exposure to Substantially the
            Same General Harmful Conditions or Substances....................19

B.     Exclusions Under the 2011 Policy .......................................................24

    1.     Impact of the Sites Endorsement on the Waste Disposal
    Site and Pollution Exclusions ....................................................24

        a.     Is the USOR Site a "Waste Disposal Site"? ...................26

    2.     Exclusion g (Auto Exclusion).....................................................27

        a.     Does Exclusion g Apply? ...............................................30

        b.     Property Damage Arising Out of the Use of an
        Auto ................................................................................32

        c.     Does Section 2 of the Transportation Coverage
        Endorsement Preclude Coverage?...................................35

V.    Conclusion and Order ......................................................................38

VI.   Appendix of Pertinent Policy Provisions……………………………40

## I.   **INTRODUCTION**

Pending before the Court in this insurance coverage dispute are the parties' cross-motions for partial summary judgment on Defendant insurer AIG Specialty Insurance Company's ("ASIC" or "Defendant") duty to defend its insureds, Plaintiffs USA Environment, L.P. ("USAE") and Bayou City Environmental Services, L.P. ("Bayou" and, together with USAE, "Plaintiffs"), in an underlying lawsuit. Plaintiffs have filed a Motion for Partial Summary Judgment on the Duty to Defend ("USAE Motion") [Doc. # 19]. ASIC has filed a Cross-Motion for Partial Summary Judgment and Opposition to the USAE Motion ("ASIC Motion") [Doc. # 21]. Plaintiffs have filed a combined reply in support of the USAE Motion and opposition to the ASIC Motion ("USAE Reply") [Doc. # 29], to which ASIC has replied in kind ("ASIC Reply") [Doc. # 30]. Plaintiffs filed a Sur-Reply [Doc. # 36], and ASIC a Sur-Sur Reply [Doc. # 37].[1] After carefully considering the

---

[1]     At the Court's invitation, both parties also filed supplemental briefs addressing certain issues. *See* ASIC Supplemental Briefing [Doc. # 39], Plaintiffs' Letter dated May 18, 2017 ("USAE Supplemental Briefing") [Doc. # 40].

Motions, Replies, all related filings, and the relevant law, the Court **grants** the USAE Motion [Doc. # 19] and **denies** the ASIC Motion [Doc. # 21].

## II.    FACTUAL BACKGROUND

The parties dispute, among other things, whether ASIC has a duty to defend Plaintiffs in an environmental damage case currently pending in federal court. Plaintiffs claim coverage under several Commercial General Liability and Professional Liability insurance policies for periods covering, collectively, January 3, 2003 to January 3, 2014 (collectively, the "Policies"). Provisions of the Policies that are relevant to this dispute are excerpted in the appendix to this Memorandum and Order ("Appendix").

### A.    The Underlying Lawsuit[2]

USAE and Bayou engage in "environmental activities" on behalf of waste generators.[3] Plaintiffs' work includes the brokering and transportation of waste material to sites at which the waste will be recycled and/or otherwise disposed of.[4] That work is at issue in an underlying lawsuit ("Underlying Lawsuit"), presently pending in the United States for the Southern District of Texas,[5] concerning environmental remediation efforts at a site located in Pasadena, Texas (the "USOR Site"). The USOR Site encompasses approximately 18 acres and is comprised of two separate properties, the former U.S. Oil Recovery and MCC Recycling

---

[2]    The following facts are primarily derived from allegations in the operative complaint in the underlying lawsuit *USOR Site PRP Group v. A-1 Cleaning Septic Service, LLC et al.*, Civil Action No. 4:14-cv-02441 ("Underlying Lawsuit").

[3]    USAE Motion [Doc. # 19], at 2.

[4]    *Id.*

[5]    *See supra* note 2.

facilities.[6]  The MCC facility portion of the USOR Site is located on either side of Vince Bayou, and lays southeast across railroad tracks from the U.S. Oil Recovery facility.[7]  The City of Pasadena, Texas, a defendant in the Underlying Lawsuit, owned and operated the MCC facility from approximately 1944 until January, 2009, when U.S. Oil Recovery acquired that facility from the City.[8]  Throughout its operating life, the U.S. Oil Recovery facility received and performed wastewater pretreatment of municipal and industrial Class I and II wastewater, "characteristically hazardous waste," used oil and oily sludges, and municipal solid waste.[9]  Associated operations were conducted at the MCC Recycling facility portion of the USOR Site after U.S. Oil Recovery acquired that facility in 2009.[10]

The USOR Site was abandoned by its owners and operators in June, 2010.[11] The following month, in July, 2010, a state court-appointed receiver was granted legal control and custody over the USOR Site.[12]  The receiver's role is to assist in performance of authorized response actions at the USOR Site, among other

---

[6]     Third Amended Complaint in *USOR Site PRP Group v. A-1 Cleaning Septic Service, LLC et al.*, Civil Action No. 4:14-cv-02441, Exh. L to USAE Motion ("USOR Grp. Complt") [Doc. # 19-1], at 12.

[7]     *See id.* at 14.

[8]     *See id.* at 12.  Seven Trent Services, also a defendant in the Underlying Lawsuit, operated the MCC Recycling facility from March, 1994, through April, 2004.  *Id.*

[9]     USOR Grp. Complt, at 12.

[10]    *Id.*

[11]    *Id.* at 13.

[12]    *Id.*

responsibilities.[13]

On July 1, 2010, the Texas Commission on Environmental Quality and Harris County Public Health and Environmental Services contacted the National Response Center and U.S. Environmental Protection Agency ("EPA") hotlines to request assistance in stabilizing the USOR Site and managing a large volume of hazardous substances and waste in preparation for the upcoming season.[14] The EPA conducted emergency response actions at the USOR Site in July, 2010, November, 2010, and January, 2011, and identified a "historic an[d] ongoing release of hazardous substances" at and around the USOR Site.[15] In total, the EPA removed approximately 833,500 gallons of contaminated liquids from the USOR Site during the three emergency response actions.[16] The EPA proposed the Site be added to the National Priorities List on September 16, 2011.[17] It was formally added to the List on September 18, 2012, rendering it a Superfund site.[18]

Several potentially responsible parties ("PRPs"), including plaintiffs in the Underlying Lawsuit ("USOR Site PRP Group"), entered into settlement agreements with the EPA on August 25, 2011 ("First Removal Action") and July

---

[13] *See id.*

[14] *Id.*

[15] *Id.* at 14, 16.

[16] *Id.* at 15.

[17] ASIC Motion [Doc. # 21], at 4 n.8 (citing EPA Superfund Program: US OIL Recovery, PASADENA, TX, accessed February 21, 2017, https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0607093). Superfund sites are parcels of land the EPA has identified as contaminated by hazardous substances at levels that may present a threat to human health or the environment.

[18] *Id.* at 4.

14, 2016 ("Second Removal Action").[19]   The First and Second Removal Actions obligate the PRPs to perform time-sensitive removal action activities at the USOR Site, which efforts are ongoing.[20]   Additionally, members of the USOR Site PRP Group commit to paying future response costs the EPA incurs at the USOR Site after the effective dates of the agreements in the Removal Actions.[21]   Through July 31, 2016, the USOR Site PRP Group has incurred approximately $10,000,000 in response costs at the USOR Site in performing specified activities required by the First and Second Removal Actions.[22]

On December 20, 2012, the EPA advised USAE by letter ("EPA General Notice") that USAE is potentially liable under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, with respect to the USOR Site as a person who arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances, and invited USAE to join the First Removal Action.[23]   USAE allegedly timely notified ASIC of the EPA General Notice ("2013

---

[19]     *See* USOR Grp. Complt, at 17-18.

[20]     *See id.*

[21]     *See id.* at 17-18.   The Second Removal Action also requires participating potentially responsible parties ("PRPs") to provide an advance payment of $50,000 of EPA's future response costs.   *See id.* at 18.

[22]     *Id.* at 20.   The amount also includes expenses the USOR Site PRP Group incurred conducting a "Remedial Investigation/Feasibility Study" of the U.S. Oil Recovery facility related to the remediation efforts, which activities are not yet completed.   *See id.* at 18.

[23]     *See* General Notice Letter, dated December 20, 2012, Exh. M to USAE Motion [Doc. # 19-1], at ECF 1481.   The EPA sent USAE a supplementary letter on January 8, 2013, that included information inadvertently left out of the first
(continued…)

USAE Claim") and submitted a claim for coverage under ASIC-issued Commercial General Liability and Professional Liability Policy PROP 5844513, effective January 3, 2005 to January 3, 2006 ("2005-2006 Policy").[24] ASIC denied coverage by letter dated March 12, 2013 ("Denial Letter"), disclaiming coverage under one exclusion and reserving the right to deny coverage under a second.[25]

In March, 2013, approximately three months after receiving the EPA General Notice, USAE entered into a cost-sharing agreement (the "Participation Agreement") with other PRPs (the "USOR Site PRP Group") that governed cost-sharing among the USOR Site PRP Group with respect to participating PRPs' clean-up removal activities at the USOR Site.[26] At some point thereafter USAE withdrew from the USOR Site PRP Group because, USAE now argues, it lacked support from ASIC and faced increasing expense and uncertainty by virtue of its participation.[27]

---

(continued…)
General Notice. *See* Enclosure for General Notice Letter, dated January 8, 2013, Exh. N to USAE Motion [Doc. # 19-1], at ECF 1484.

[24] *See* USAE Motion [Doc. # 19], at 10.

The record does not include the 2013 USAE Claim, but does include ASIC's response denying USAE's claim under the 2005-2006 Policy. *See* Denial Letter, dated March 12, 2013, Exh. O to USAE Motion ("ASIC Denial Letter") [Doc. # 19-1], at 3-4, ECF 1489-90. The record also includes a claim Bayou made to ASIC in 2016 referencing the 2013 USAE Claim. *See* Claim for Insured Bayou City Environmental Services, LP, dated May 10, 2016 ("Bayou Claim"), Exh. P, Attachment 1, to USAE Motion [Doc. # 19-1], at ECF 1459-1502.

[25] *See* Denial Letter, dated March 12, 2013, Exh. O to USAE Motion [Doc. # 19-1], at 3-4, ECF 1489-90.

[26] *See* USOR Grp. Complt, at 462, 492.

[27] *See* USAE Motion [Doc. # 19], at 10.

The USOR Site PRP Group allegedly notified Plaintiff Bayou by letter dated July 10, 2014, that Bayou faced potential liability in connection with its work at the USOR Site.[28] The USOR Site PRP Group offered Bayou "the opportunity to voluntarily join in the USOR Site PRP Group's efforts at the USOR Site." Bayou refused.[29]

On August 24, 2014, the USOR Site PRP Group filed the Underlying Lawsuit against hundreds of defendants, including USAE and Bayou.[30] The USOR Site PRP Group alleges, in relevant part, that from April, 2004 to July, 2008, USAE and Bayou each transported, or arranged for the transport and disposal of, waste materials to the USOR Site on behalf of themselves and various other parties.[31] With respect to Bayou, the USOR Site PRP Group alleges, *inter alia*, that

> [F]rom at least April 2004 to July 2008, [Bayou] accepted for transport to the USOR Site, which was selected by [Bayou], and/or by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment of waste owned or possessed by [Bayou], at least 5,801,744 gallons of waste containing hazardous substances at the USOR Site.[32]

---

[28]  *See* USOR Grp. Complt, at 54.

[29]  *See id.* at 55.

[30]  *See* USAE Motion [Doc. # 19], at 10; ASIC Motion [Doc. # 21], at 5.

[31]  *See, e.g.*, USOR Grp. Complt, at 41, 52-55, 74, 174, 195, 196, 200, 350, 374, 423, 430, 460-61, 472, 476. The USOR Site PRP Group alleges, in the alternative, that one of the Plaintiffs is responsible for certain actions attributable to the other Plaintiff. *See, e.g., id.* at 55 ("Alternatively, [USAE] is responsible for some or all of the waste streams attributable to Bayou …").

[32]  *Id.* at 52.

With respect to USAE, the USOR Site PRP Group alleges, *inter alia*, that

> [F]rom at least January 2004 to February 2008, [USAE] accepted for transport to the USOR Site, which was selected by [USAE], and/or by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment of waste owned or possessed by [USAE], at least 5,762,581 gallons of waste containing hazardous substances at the USOR Site."[33]

Additionally, the USOR Site PRP Group claims that USAE breached the Participation Agreement by refusing to pay USAE's share of response costs the USOR Site PRP Group incurred prior to USAE's rescinding the Participation Agreement.[34] The USOR Site PRP Group seeks cost recovery, contribution, and declaratory relief under CERCLA, and cost recovery under the Texas Solid Waste Disposal Act ("TSWD"), Tex. Health & Safety Code § 361.001 *et seq.*[35] The USOR Site PRP Group also seeks a judgment against USAE with respect to the breach of contract claim, namely, that USAE is liable for its unpaid assessments of response costs, along with interest, costs of suit, and attorneys' fees and consultant fees.[36]

## B. Procedural Posture

USAE and Bayou are named insureds under eleven CGL policies (each referred to as a "Policy"). ASIC issued Policies covering USAE for the periods

---

[33] *Id.* at 460.

[34] *See id.* at 492.

[35] *See id.* at 482-91.

[36] *See id.* at 493.

from January 3, 2003 to January 3, 2014.[37]  As noted, in 2013, USAE allegedly submitted a claim to ASIC under the 2005-2006 Policy, after USAE had received the EPA General Notice but before USAE was named a defendant in the Underlying Lawsuit.[38]  On May 10, 2016, Bayou filed a claim with ASIC for coverage under Policies covering, collectively, the period between January 3, 2003 and January 3, 2010 ("Bayou Claim").[39]  The Bayou Claim states that ASIC was notified of the underlying claim at issue by USAE's 2013 claim.[40]  Bayou requested "all insurance coverage under any policies sold to [Bayou] by [ASIC] … for the environmental claim."[41]

On July 26, 2016, before ASIC responded to the Bayou Claim, USAE and Bayou filed the instant insurance coverage lawsuit against ASIC seeking declaratory judgments with respect to ASIC's duty to defend and duty to indemnify Plaintiffs in connection with claims relating to the alleged environmental liabilities at the USOR Site.[42]

---

[37]     Plaintiffs included copies of the eleven Policies in Exhibit 1 to the USAE Motion. *See* Exhs. A through K, Attachment 1, to USAE Motion [Doc. # 19-1].  Defendant attached that Exhibit to the ASIC Motion.  *See* Attachments 1-5 to ASIC Motion [Docs. # 21-1, # 21-2, # 21-3, # 21-4, # 21-5].

[38]     *See* USAE Motion [Doc. # 19] at 10; Bayou Claim [Doc. # 19-1], at ECF 1500.

[39]     Bayou Claim [Doc. # 19-1], at 1-4, ECF 1459-1502.

[40]     *See* Bayou Claim [Doc. # 19-1], at 1-2, at ECF 1499-1500 ("The claim arises from alleged releases of hazardous substances at the U.S. Oil Recovery Superfund Site … [USAE] previously provided notice of this claim under [the 2005-2006 Policy] in 2013.")

[41]     *Id.* at 2, at ECF 1500.

[42]     *See* Complaint [Doc. # 1], at 9-10.  Plaintiffs also seek damages, attorneys' fees and pre-judgment interest on costs and expenses arising from ASIC's alleged breaches of the insurance policies it issued Plaintiffs; damages and attorneys' fees
(continued…)

The pending Motions are limited to two issues: whether ASIC owes Plaintiffs a duty to defend with respect to the Underlying Lawsuit, and whether ASIC has breached that duty.

## III.    LEGAL STANDARDS

### A.    Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides for the entry of summary judgment against a plaintiff who fails to make a sufficient showing of the existence of an element essential to his case and on which he will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) (*per curiam*).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 322–23; *Curtis*, 710 F.3d at 594.

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the nonmoving party.  *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant.  *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The Court may make

---

(continued…)
in connection with ASIC's alleged state law violation for delaying to provide a defense or defense costs; and any other relief the Court deems proper.  *See id.* at 10, 12-13.  The pending Motions are limited to Defendant's duty to defend.

no credibility determinations or weigh any evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe. *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412–13). The Court is not required to accept the non-movant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence. *Id.* (citing *Reaves Brokerage*, 336 F.3d at 413); *Little*, 37 F.3d at 1075. Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. *See* Fed. R. Civ. P. 56(c)(4); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000).

"When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (internal citations and quotations omitted); *Williams v. Valenti*, 432 F. App'x 298, 302 (5th Cir. 2011).

### B. Legal Principles for Interpretation of Insurance Contracts and Assessment of the Duty to Defend

The Court has subject matter jurisdiction over this action based on complete diversity of citizenship of the parties. The Court therefore is bound to apply the substantive law of the forum state and follow federal procedural rules. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Hall v. G.E. Plastic Pac. PTE Ltd.*, 327 F.3d 391, 395 (5th Cir. 2003). Here, the parties agree that Texas law governs substantive issues of insurance law.

Texas courts interpret insurance policies according to the rules of contract interpretation. *Int'l Ins. Co. v. RSR Corp.,* 426 F.3d 281, 291 (5th Cir. 2005) (citing *Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex. 1998)); *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex. 1994) ("Interpretation of insurance contracts in Texas is governed by the same rules as the interpretation of other contracts."). "In applying these rules, a court's primary concern is to ascertain the parties' intent as expressed in the language of the policy." *Int'l Ins. Co.,* 426 F.3d at 291; *see also Forbau,* 876 S.W.2d at 133 ("[T]he court's primary concern is to give effect to the written expression of the parties' intent."). Unless the policy dictates otherwise, courts "give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *See RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015). "'No one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions.'" *Id.* (quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994)). The court must give effect to all of a policy's provisions so that none is rendered meaningless. *Int'l Ins. Co.,* 426 F.3d at 291.

Under the "eight corners rule" of Texas insurance law, "a court looks only at the insurance policy itself and the pleadings in the complaint in the underlying suit" to determine whether a lawsuit would give rise to a covered claim. *See Hartford Cas. Ins. Co. v. DP Eng'g, L.L.C.*, 827 F.3d 423, 426 (5th Cir. 2016). "The duty [to defend] is triggered if the plaintiff [in an underlying lawsuit] alleges facts that would give rise to any claim against the insured that is covered by the policy." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 31 (Tex. 2008) (citing *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.,* 141 S.W.3d 198, 201 (Tex. 2004)).

13

The eight corners rule is to be applied liberally in favor of the insured, with any doubts resolved in favor of the insured. *Guaranty Nat'l Ins. Co. v. Azrock Indus., Inc.,* 211 F.3d 239, 243 (5th Cir. 2000) *overruled on other grounds as recognized by OneBeacon Ins. Co. v. Don's Bldg. Supply Inc.*, 553 F.3d 901, 903 (5th Cir. 2008) (per curiam). "If *any* allegation in the complaint is *even potentially* covered by the policy then the insurer has a duty to defend its insured." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 552 (5th Cir. 2004) (quoting *Enserch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1492 (5th Cir. 1992) (emphasis in original); *accord Fed. Ins. Co. v. Northfield Ins. Co.*, 837 F.3d 548, 553 (5th Cir. 2016) (quoting *Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389, 393 (5th Cir. 1995)).

In an insurance coverage dispute analyzed under the eight corners rule, "[t]he insured bears the initial burden of showing that there is coverage, while the insurer bears the burden of proving the applicability of any exclusions in the policy." *Id.* at 552-53. "If the insurer succeeds in showing the applicability of an exclusion, the burden shifts back to the insured to show that an exception to the exclusion brings the claim within coverage." *KLN Stell Products Co. v. CAN Ins. Cos.*, 278 S.W.3d 429, 434 (Tex. App.—San Antonio 2008, pet. denied).

If only one party's construction of a policy is reasonable, the policy is unambiguous and the Court will adopt that party's construction. *RSUI Indem.*, 466 S.W.3d at 118. If both constructions are reasonable, however, the Court "must resolve the uncertainty by adopting the construction that most favors the insured[.]" *See id.* (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991). "'The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.'"

14

*Trinity Universal Ins. Co. v. Empl'rs Mut. Cas. Co.*, 592 F.3d 687, 692 (5th Cir. 2010) (quoting *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.,* 141 S.W.3d 198, 202 (Tex. 2004)).  "Where the question of interpretation involves an exception or limitation on the insurer's liability under the policy, an even more stringent construction is required."  *See Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 212 (5th Cir. 2009) (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987)).

## IV.  <u>ANALYSIS</u>

The provisions of the eleven Policies relevant to the pending Motions are, with one exception, nearly identical.[43]  The scope of coverage for property damage" is established by Coverage A[44] of the "Insuring Agreement" at section I(A)(1)(a) of each Policy:

> We [ASIC] will pay those sums that the insured becomes legally obligated to pay as damages because of **bodily injury**[45] or **property damage** to which this insurance applies.  We will have the right and duty to defend the insured against any **suit** seeking those damages.  However, we will have no duty to defend the insured against any **suit** seeking damages for **bodily injury** or **property damage** to which this insurance does not apply.  We may at our discretion investigate any **occurrence** and settle any **claim** or **suit** that may result . . . .[46]

---

[43]    The 2011-2014 Policies include a "Blanket Non-Owned Disposal Sites Endorsement."  *See infra* Section IV.B.

[44]    The coverage at issue in the present case is Coverage A: "Bodily Injury and Property Damage Liability."

[45]    Defined terms in the Policies are bolded here, as in the Policies.

[46]    *See, e.g.*, CGL Policy effective January 3, 2003 – January 4, 2004, Exh. A, Attachment 1, to USAE Motion ("2003-2004 Policy") [Doc. # 19-1], at 1, at ECF 13, § I(A)(1)(a) (emphasis in original); *see infra* Appendix, at 40.

Section I(A)(1)(b) of the Insuring Agreement defines the scope of the phrase "property damage to which this insurance applies." Section I(A)(1)(b) provides:

> b. This insurance applies to . . . **property damage** only if:
>
> (1) The . . . **property damage** is caused by an **occurrence** that takes place in the **coverage territory**; and
>
> (2) The . . . **property damage** occurs during the **policy period**.[47]

There is no dispute that section I(A)(1)(b) of the Insuring Agreement, standing alone, would trigger Defendant's duty to defend in this context. Specifically, ASIC does not disagree that the alleged property damage was caused by an occurrence that takes place in the coverage territory, and that the property damage occurred during the Policies' policy periods. The issues that divide the parties are whether Plaintiffs may obtain coverage under any of the Policies or whether any of the following three exclusions in the Policies independently preclude coverage: (1) the Pollution Exclusion (Exclusion f), (2) the Waste Disposal Site Exclusion (Exclusion u), and (3) the Aircraft, Auto or Watercraft Exclusion (Exclusion g), as modified by a Transportation Coverage Endorsement.[48] ASIC contends that each of the three exclusions is a bar to the coverage Plaintiffs seek and demonstrates the general intent of the Policies, which ASIC asserts is to provide coverage for pollution liability that occurs while the insured's work is ongoing, and to exclude coverage for liability in connection with waste that the insured previously transported to and relinquished at a waste disposal site.[49]

---

[47]    Policies, Exhs. A-K to USAE Motion [Doc. # 19-1], § I(A)(1)(b) (emphasis in originals).

[48]    *See* ASIC Reply [Doc. # 30], at 1, 7, 20; ASIC Sur-Sur Reply [Doc. # 37], at 2.

[49]    *See* ASIC Motion [Doc. # 21], at 10-11; ASIC Reply [Doc. # 30], at 19-20.

16

Plaintiffs disagree and argue the Court need not reach the Pollution Exclusion or the Waste Disposal Site Exclusion. Significantly, the Policies covering January, 2011 to January, 2014, include an endorsement that creates an exception to the Pollution Exclusion for "waste disposal sites" and deletes the Waste Disposal Site Exclusion. Plaintiffs argue that they have a viable claim under the 2011 Policy. ASIC, however, contends that, to the extent Plaintiffs have a claim for coverage, Plaintiffs' claims are limited to the 2003-2004 Policy, with respect to USAE, and the 2004-2005 Policy, for Bayou.

The Court concludes that Plaintiffs may pursue their claims under the 2011 Policy. The Court next concludes that the Aircraft, Auto or Watercraft Exclusion (Exclusion g), as amended by an Endorsement No. 10 to the 2011 Policy, is the only applicable exclusion under the 2011 Policy. Finally, the Court determines that Exclusion g does not bar coverage. ASIC therefore has a duty to defend Plaintiffs in the Underlying Lawsuit, and has breached that duty.

## A. The 2011 Policy

### 1. Paragraph 6 of the Pollution Exclusion

The Policies include Exclusion f — Pollution ("Pollution Exclusion"), which establishes a bar to coverage for, in part, "property damage arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time," which exclusion is subject to exceptions in paragraph f(4) ("Exception 4") and f(5) ("Exception 5").[50]

The Pollution Exclusion also sets forth rules for determining which Policies are implicated if coverage exists for property damage pursuant to Exception 4 and Exception 5. Paragraph 6 of the Pollution Exclusion ("paragraph 6") provides:

---

[50] *See infra* Appendix, at 40-41.

(6)     With respect to paragraphs (4) and (5) of this exclusion, in determining whether … **property damage** has occurred during the **policy period**, the following rules apply:

(a)     Progressive, indivisible … **property damage** over a period of days, weeks, months or longer, caused by related or continuous exposure to substantially the same general harmful conditions or substances, shall be deemed to have occurred only on the date of first exposure to such conditions or substances.

(b)     However, if the date of first exposure cannot be determined, or is before the inception date of the first policy we issued to you which provides coverage substantially similar to that provided under paragraphs (4) and (5) above, but the progressive, indivisible … **property damage** continues in fact to exist during this **policy period**, it will be deemed to have occurred only on the inception date of the first such Policy.

(c)     An **occurrence** may result in … **property damage** which occurs during the policy periods of different policies we issued to you which provide coverage substantially similar to that provided under paragraphs (4) and (5) of this exclusion.  In that case, all … **property damage** resulting from such **occurrence** shall be subject to the Each Occurrence Limit applicable to the first such Policy during which any of such … **property damage** occurred.[51]

ASIC contends that the USOR Group's Complaint alleges "continuous, progressive injury" that, pursuant to paragraph 6, is deemed to have occurred only on the date of first exposure or the inception date of the first Policy at issue for each of the Plaintiffs—*i.e.*, the 2003-2004 Policy for USAE, and the 2004-2005 Policy for Bayou.[52]  Plaintiffs respond that because the USOR Group's Complaint alleges property damage resulting from, in Plaintiffs' formulation, "*different*

---

[51]     *See, e.g.*, 2003-2004 Policy [Doc. # 19-1], at 4, at ECF 16, § I(A)(2)(f)(6) (emphasis in original).

[52]     *See* ASIC Motion [Doc. # 21], at 19.

hazardous substances that resulted from *different* deliveries in *different* years," the damage is not "indivisible" or "continuous."[53] And because the USOR Group's Complaint alleges "historic an[d] ongoing releases," Plaintiffs contend all of the Policies are potentially triggered.[54]

### 2. Progressive, Indivisible Property Damage … Caused By Related or Continuous Exposure to Substantially the Same General Harmful Conditions or Substances

In support of its position, ASIC argues that pollutants and waste comprise "the same general harmful conditions or substances," and that the USOR Group's Complaint does not allege USAE or Bayou is responsible for particular damage to the USOR Site "presumably because this is impossible to do in relation to long-term pollution occurring at a waste disposal site."[55] ASIC also focuses on the USOR Group's Complaint's allegations that Plaintiffs are "strictly, jointly and severally liable" for response costs under CERCLA[56] in connection to the "historic an[d] ongoing release of hazardous substances" observed by the EPA at the USOR Site,[57] pointing out that, under both CERCLA and the TSWDA, indivisible harm caused by multiple parties gives rise to joint and several liability. *See Halliburton Energy Servs., Inc. v. NL Industries*, 648 F. Supp. 2d 840, 848 (S.D. Tex. 2009); *Tex. Comm'n on Envtl. Quality v. Exxon Mobil Corp.*, 504 S.W.3d 532, 535 (Tex.

---

[53]     *See* USAE Reply [Doc. # 29], at 21.

[54]     *See id.*; USAE Supplemental Briefing [Doc. # 40], at 9 n.3.

[55]     *See* ASIC Supplemental Briefing [Doc. # 39], at 6-7.

[56]     *See* USOR Grp. Complt, at 486.

[57]     *See id.* at 14.

App.—Austin 2016, no pet.).[58]  Plaintiffs counter that the USOR Group's Complaint alleges that Plaintiffs transported or arranged for the transport or disposal of over 11.5 million gallons of disparate types of waste in total "generated by" at least fifty different generators from at least 2004-2008, and argue ASIC's position is unsupported by the allegations in the Underlying Lawsuit and the practicalities of EPA remedial actions.

The Court concludes that Plaintiffs have established that the USOR Group's Complaint contains allegations that permit the reasonable interpretation that the property damage alleged is not "progressive, indivisible property damage . . . caused by related or continuous exposure to substantially the same general harmful conditions or substances." *See Fair Operating, Inc. v. Mid-Continent Cas. Co.*, 193 F. App'x 302, 304-05 (5th Cir. 2006) (per curiam) (unpublished) ("There is at least doubt whether the factual allegations in the *Ayala* complaint state a cause of action covered by the policy.  Under Texas law, a duty to defend arises in such a case . . . .").  First, as ASIC acknowledges, the USOR Group's Complaint does not allege that the property damage at issue is "progressive" or "indivisible."  The USOR Group's Complaint describes the result of the EPA's emergency response actions at the USOR Site, and lists a multitude of particular volumes of specific different substances which were detected at distinct and varying locations around the USOR Site.[59]  The USOR Group's Complaint alleges that various hazardous

---

[58]  With respect to the TSWDA, the plaintiffs in the Underlying Lawsuit request that the court "hold[] that all such Defendants are liable for the response costs incurred or to be incurred by the USOR Site PRP Group . . . ."  *See id.* at 491.

[59]  *See* USOR Grp. Complt, at 16-17.  For example, the USOR Group's Complaint details the volume and location of acetone detected at the USOR Site.  *Id.* at 16.

substances were detected at both of the facilities that comprise the USOR Site.[60]  It further alleges that some of those substances were draining into the Vince Bayou, while others were discovered in above-ground tanks.[61]  Those allegations potentially encompass divisible property damage.  *Cf. Fair Operating, Inc.*, 193 F. App'x at 304-05 (underlying complaint's allegation of an "escape" of contaminants was sufficiently broad to encompass non-sudden emissions, which were not covered under the policy at issue, and sudden emissions, which were covered, and thus gave rise to duty to defend); *Hatco Corp. v. W.R. Grace & Co.*, 801 F. Supp. 1334, 1347 (D.N.J. 1992) (concluding operator of chemical manufacturing facility had not proved that disposals of chemical waste resulted in "continuous, indivisible injury" to site, and theorizing that "while it may appear that seepage and migration of chemicals into and under the ground will have been a continuous injurious process, that does not necessarily mean that surface contamination cannot be separated from the subsurface contamination, and allocated to specific policy periods for purposes of coverage.").

With respect to Plaintiffs specifically, the USOR Group's Complaint identifies various types of waste streams each Plaintiff allegedly transported and/or arranged to be disposed.[62]  Bayou, for example, is alleged to have transported and/or arranged for the disposal of waste streams including "rainwater," "non hazardous waste oil & soil," "sump sludge and water," "nonhaz plant wastewater,"

---

[60]     *See id.* at 16-17.

[61]     *See id.*

[62]     *See id.* at 53, 460-61.  USAE is also alleged to have potentially "generated" the waste streams, in addition to transporting and arranging for the disposal of the waste streams.  *See id.* at 460.

and "cutting oil and water."[63]   USAE is alleged to have generated, transported and/or arranged for the disposal of waste streams including "compressor oil," "cutting oil and water," and "non hazardous, class I, waste water[.]"[64]

The USOR Group's Complaint alleges that certain waste streams for which Bayou and USAE were allegedly responsible "contained some or all" of certain separately identifiable hazardous substances such as arsenic, cadmium, and silver.[65]   And the USOR Group's Complaint references contaminated liquids at the USOR Site that "accumulated from overflowing roll-off containers, containments, secondary containments, the retention pond, unloading bays, leaking drums and totes, and the parking lot… ."[66]   But the Complaint does not tie any deliveries by USAE or Bayou to any particular "releases" or property damage.

That Plaintiffs are alleged in the Underlying Lawsuit to be "strictly, jointly and severally liable" for response costs under CERCLA does not make the property damage from releases at the Site indivisible or progressive. Indeed, the First and Second Removal Activities allegedly are ongoing, and it is impossible to definitively conclude whether or not the property damage is "indivisible."[67]   "Doubts are resolved in favor of the duty to defend."   *Evanston Ins. Co. v. Lapolla*

---

[63]   *Id.* at 53.

[64]   *See id.* at 460.

[65]   *See id.* at 54, 461.  The lists of hazardous substances for which Bayou and USAE are each allegedly potentially responsible overlap, but differ.

[66]   *See id.* at 15.

[67]   *See id.* at 17-18.

*Industries, Inc.*, 93 F. Supp. 3d 606, 613 (S.D. Tex. 2015).[68]

The allegations in the USOR Group's Complaint accordingly do not clearly bring the case within the coverage limitations imposed by paragraph 6 of the Pollution Exclusion. *Cf. Fed. Ins. Co.*, 837 F.3d at 554 ("…[Plaintiff in underlying lawsuit] has alleged potential claims against Wagner that are not clearly excluded by the Pollution Endorsement."); *Star-Tex Res., L.L.C. v. Granite State Ins. Co.*, 553 F. App'x 366, 370 (5th Cir. 2014) (per curiam) (unpublished) ("…the Texas Supreme Court has directed courts applying Texas law to 'resolve all doubts regarding the duty to defend in favor of the duty and . . . construe the pleadings liberally." (quoting *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008))). The USOR Group's Complaint's lack of specificity regarding what releases have occurred and caused property damage, plus the express allegations of historic and ongoing releases of substances generally, allow for the possibility that Plaintiffs are responsible for releases causing property damage that trigger the 2011 Policy.[69]

USAE and Bayou are entitled to seek a duty to defend under the 2011 Policy.

---

[68]    ASIC cites *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1095 (5th Cir. 1973), and *Texas Comm'n on Envtl. Quality v. Exxon Mobil Corp.*, 504 S.W.3d 532, 535 (Tex. App.—Austin 2016, no pet.), in support of its argument that the USOR Group's Complaint "implies" that the damage is indivisible by seeking joint and several liability under CERCLA. *See* ASIC Supplemental Briefing [Doc. # 39], at 7 nn.15 & 16. Neither case is an insurance coverage case evaluating whether underlying allegations give rise to the reasonable inference that property damage is "indivisible." Neither is persuasive support for ASIC's position.

[69]    The allegations in the USOR Group's Complaint allow for the possibility that releases of Plaintiffs' transported substances occurred only during and after 2011, for example, or during every year between 2004 through 2016.

**B.    Exclusions Under the 2011 Policy**

As noted, ASIC argues that three exclusions preclude coverage: (1) the Pollution Exclusion, Exclusion f; (2) Exclusion u, the "Waste Disposal Site" Exclusion, and (3) Exclusion g, the "Aircraft, Auto or Watercraft" Exclusion, which is amended by Endorsement 10 (the "Transportation Coverage Endorsement").[70]  Plaintiffs counter that a "Blanket Non-Owned Disposal Sites Endorsement" ("Sites Endorsement") added to each of the 2011-2014 Policies, which Endorsement deletes the Waste Disposal Site Exclusion (Exclusion u) in its entirety and creates an exception to the Pollution Exclusion, renders those two exclusions inapplicable.  Plaintiffs further argue that Exclusion g, the "Auto Exclusion" for present purposes,[71] even as modified by the Transportation Coverage Endorsement, does not bar coverage.

**1.    Impact of the Sites Endorsement on the Waste Disposal Site and Pollution Exclusions**

The Sites Endorsement provides, in pertinent part:

1.    SECTION I. COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY paragraph 2. Exclusions, subparagraph u. **Waste Disposal Site** is deleted in its entirety.

2.    SECTION I. COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY paragraph 2. Exclusions, subparagraph f. **Pollution** is amended by the addition of the following:

(7)    Parts (1) and (2) of this exclusion do not apply to **waste disposal sites**.

\* \* \* \*

---

[70]    *See infra* Appendix.

[71]    *See infra* note 81.

4.    SECTION IV. DEFINITIONS paragraph 29 is deleted in its entirety and replaced with the following:

29.    **Waste Disposal Sites** means all waste treatment, waste storage or waste disposal facilities utilized by or on behalf of the Named Insured provided that such **waste disposal sites** are:

i.    Properly licensed to accept and dispose of waste and in compliance with applicable federal, state, provincial or local laws . . . .

ii.    As of the Policy inception date, such facility is not listed, not proposed and has never been listed on the federal National Priorities List (Superfund), State equivalent list, or local equivalent list;

iii.    As of the Policy inception date, such facility is not subject to Federal information requests under Section 104(e) of CERCLA or Section 3007 (a) of RCRA or[] State or Local equivalent requests; and

iv.    As of the Policy inception date or date that the waste is accepted from the Named Insured, whichever is later, the **waste disposal site**, its owners and operators are not in bankruptcy or financial insolvency.[72]

Whether the USOR Site is or is not a "waste disposal site," as defined by the Sites Endorsement, dictates whether the Sites Endorsement's exception to the Pollution Exclusion is applicable. ASIC argues that even if Plaintiffs may seek coverage under the 2011 Policy, the Sites Endorsement does not apply because the USOR Site does not meet the definition of "waste disposal site" introduced by the Endorsement. The Court is unpersuaded by ASIC's argument.

---

[72]    *See, e.g.*, Blanket Non-Owned Disposal Sites Endorsement, Endorsement No. 24 to 2011-2012 Policy [Doc. # 19-1], at 1-2, at ECF 691-92 (emphasis in original); *see infra* Appendix, at 48.

## a. Is the USOR Site a "Waste Disposal Site"?

ASIC contends that the USOR Site was not a "waste disposal site" under the 2011 Policy[73] because the USOR Group's Complaint alleges that the Site was abandoned in 2010 and is being operated by a state-appointed receiver, both of which facts, ASIC asserts, indicate insolvency and/or bankruptcy and thus remove the USOR Site from the purview of the "waste disposal site" definition.[74]   In support of its position, ASIC points to the following allegations in the USOR Group's Complaint:

> The USOR Site property was abandoned by the owners and operators in June 2010.  In July 2010, a State court appointed a Receiver with legal custody and control over the USOR Site.  Among other things, the Receiver's role is to assist the USOR Site PRP Group in its performance of EPA-approved response actions at the USOR Site.[75]

Plaintiffs persuasively argue that ASIC's inference is unjustified.  The Court "must consider 'any reasonable inferences that flow from the facts alleged." *See Star-Tex Res., L.L.C.*, 553 F. App'x at 370 (quoting *Lib. Mut. Ins. Co. v. Graham*, 473 F.3d 596, 601 (5th Cir. 2006)).  The USOR Group's Complaint does not include express allegations that the USOR Site, its owners, or its operators are in bankruptcy or are financially insolvent, or other allegations that give rise to

---

[73]   Plaintiffs do not dispute that the USOR Site was proposed for listing on the National Priorities List in September 2011, and is therefore not a "waste disposal site" under the 2012-2014 Policies.  *See* USAE Reply [Doc. # 29], at 17; *supra* note 17 and accompanying text.  Plaintiffs assert, however, that there is coverage under the 2011 Policy, effective January 3, 2011, because the USOR Site was not proposed for the List at the inception of that Policy.  *See* USAE Sur-Reply [Doc. # 36], at 2 n.3.

[74]   *See* ASIC Reply [Doc. # 30], at 16; ASIC Sur-Sur Reply [Doc. # 37], at 8 n.13.

[75]   USOR Grp. Complt, at 13.

reasonable inferences in support of those circumstances. Indeed, the USOR Group's Complaint alleges merely that the owners and operators abandoned the USOR Site.[76] Therefore, for purposes of the duty to defend analysis, the USOR Site is a "waste disposal site" under the 2011 Policy, and the Sites Endorsement-created exception to the Pollution Exclusion applies.

To recap, the Sites Endorsement deletes Exclusion u, the Waste Disposal Site Exclusion, and creates an exception to the Pollution Exclusion with respect to waste disposal sites. The USOR Group's Complaint permits the argument that the USOR Site is a "waste disposal site" under the 2011 Policy. Thus, under the 2011 Policy, Exclusion g, *i.e.*, the Auto Exclusion, is the only remaining exclusion on which ASIC relies to argue coverage is barred.

## 2. Exclusion g (Auto Exclusion)

Exclusion g, the Auto Exclusion for present purposes, in relevant part precludes coverage for:

> … **property damage** arising out of the ownership, maintenance, use or entrustment to others of any aircraft, **auto** or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and **loading or unloading**.[77]

"Auto" is defined, in pertinent part, as a "land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment."[78] There are six exceptions to this Exclusion, one of which—

---

[76] *See supra* Section II.

[77] *See* 2011-2012 Policy [Doc. # 19-1], at 4, at ECF 626, § II(g) (emphasis in original); *see infra* Appendix, at 43.

[78] *See* 2011-2012 Policy [Doc. # 19-1], at 23, at ECF 645, § VI(2); *see infra* Appendix, at 44.

paragraph g(6)—is pertinent to ASIC's potential duty to defend.

Exclusion g is modified in all Policies, including the 2011 Policy, by an endorsement entitled "Amendment of Aircraft, Auto or Watercraft Exclusion (Transportation Coverage)" ("Transportation Coverage Endorsement"). The Transportation Coverage Endorsement in Section 1 provides:

> 1. It is hereby agreed that SECTION I, COVERAGE A. – BODILY INJURY AND PROPERTY DAMAGE LIABILITY, paragraph 2. EXCLUSIONS, subparagraph g(6) is deleted in its entirety and replaced with the following:
>
>> (6) … **[P]roperty damage** within the exceptions described in sub-paragraphs (4) [ongoing work] and (5) [products-completed operations hazard] of Exclusion f., Pollution … and which arises out of:
>>
>>> (a) **loading or unloading** of any aircraft, **auto** or watercraft owned or operated by or rented or loaned to any insured; or
>>>
>>> (b) transportation of materials at, to or from any job site in the course of the performance of **your work**.[79]

---

[79] Endorsement No. 10 to 2011-2012 Policy ("Transportation Coverage Endorsement to 2011 Policy") [Doc. # 19-1], at 1, at ECF 672 (emphasis in original); *see infra* Appendix, at 47.

The Policies define **Your work** as:

> a. Work or operations performed by you or on your behalf; and
>
> b. Materials, parts or equipment furnished in connection with such work or operations.

**Your work** includes:

> a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your work**; and
>
> b. The providing of or failure to provide warnings or instructions.

(continued…)

In Section 2, the Transportation Coverage Endorsement provides:

> 2. It is hereby agreed that solely with respect to this endorsement, the following is added to SECTION I., COVERAGE A. - BODILY INJURY AND PROPERTY DAMAGE LIABILITY, paragraph 2, EXCLUSIONS:
>
> > … **[P]roperty damage** which occurs subsequent to the time the transported material reaches its final destination or while it is in storage off-loaded from the conveyance which was transporting it.[80]

Plaintiffs' argument is two-fold: first, Exclusion g, the Auto Exclusion, is not triggered by allegations in the USOR Group's Complaint and, second, the Transportation Coverage Endorsement does not come into play unless Exclusion g applies. Because Exclusion g does not apply, Plaintiffs contend, the Transportation Coverage Endorsement is likewise inapplicable. ASIC argues that Exclusion g, even considered separately from the Transportation Coverage Endorsement, applies and, in any event, the Transportation Coverage Endorsement necessarily adds a ground to Exclusion g that bars coverage.

---

(continued…)
*See, e.g.*, 2011-2012 Policy [Doc. # 19-1], at 23, at ECF 651, § VI(31).

[80] Transportation Coverage Endorsement to 2011 Policy [Doc. # 19-1], at 1, at ECF 672 (emphasis in original); *see infra* Appendix, at 47.

In contrast, the original language of subparagraph g(6) is as follows:

> (6) … **property damage** within the exceptions described in sub-paragraphs (4) and (5) of [the Pollution Exclusion], and which is caused by:
>
> > (a) **Loading or unloading** of any aircraft, **auto** or watercraft owned or operated by or rented or loaned to any insured; or
> >
> > (b) Transportation of materials on the job site where you are performing **your work**.

### a. Does Exclusion g Apply?

Exclusion g precludes coverage for property damage arising from "use" of an "auto," as both terms are defined in the Policy.[81] Plaintiffs argue that Exclusion g does not apply because the USOR Group's Complaint is silent with respect to how USAE and Bayou allegedly transported materials to the USOR Site. Plaintiffs also argue that the property damage alleged does not "arise out of use of an auto" under well-established Texas law.[82] The Court agrees with both theories.

The USOR Group's Complaint alleges that Plaintiffs are at least partly responsible for property damage at the USOR Site caused by waste streams containing hazardous substances. Plaintiffs' alleged liability is rooted in alleged transportation, or arranging of transportation, of hazardous substances to the USOR Site. The mode of transportation, however, is never specified. For example, the USOR Group's Complaint's allegations with respect to USAE include the following:

- 2765. According to USOR Site Records, from at least January 2004 to February 2008, Defendant USA Environment, LP ("USA Environment"), which is also known as USA Industrial Services ("USA Industrial Services") and/or does business as USA Industrial Services, accepted for transport to the USOR Site, which was selected by USA Environment, and/or by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment of waste owned or possessed by USA

---

[81] The Court follows the parties' lead and focuses the analysis of Exclusion g on "use" of an "auto," rather than ownership or use of other vehicles.

[82] The Court need not reach Plaintiffs' additional contention that the alleged property damage does not stem from transportation, but arises instead from releases of hazardous waste for various reasons while the waste was onsite at the USOR Site.

Environment, at least 5,762,581 gallons of waste containing hazardous substances at the USOR Site.[83]

- 2770. The waste streams USA Environment and/or USA Industrial Services generated, transported to and/or arranged for disposal at the USOR Site fall within the definition of "solid waste" under the TSWDA.[84]

Similarly, the USOR Group's Complaint alleges, *inter alia*, the following regarding Bayou:

- 225. According to USOR Site Records, from at least April 2004 to July 2008, Defendant Bayou City Environmental Services, LP doing business as USA Waste Transportation Services ("Bayou City Environmental") accepted for transport to the USOR Site, which was selected by Bayou City Environmental, and/or by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment of waste owned or possessed by Bayou City Environmental, at least 5,801,744 gallons of waste containing hazardous substances at the USOR Site.[85]

- 230. The waste streams Bayou City Environmental transported and/or arranged for disposal fall within the definition of "solid waste" under the TSWDA.[86]

It is clear that Plaintiffs are alleged to have transported materials; how they transported those materials, however, is unspecified. The USOR Group's

---

[83]    USOR Grp. Complt, at 460.

[84]    *Id.* at 462.

[85]    *Id.* at 52.

[86]    *Id.* at 54.

Complaint refers to both a parking lot[87] and railroad tracks[88] on the USOR Site, suggesting at least two possible forms of transportation. The railroad does not constitute an "auto" under the Policy for purposes of triggering Exclusion g. There are no factual allegations before this Court that can be considered within the eight corners rule that Plaintiffs transported all the allegedly hazardous materials to the USOR Site by "auto" as defined under the Policy. "All doubts regarding the duty to defend are resolved in favor of the insured." *See Fed. Ins. Co.*, 837 F.3d at 552 (citing *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002)). "'Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, *potentially*, a case under the complaint within coverage of the policy.'" *Id.* (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. Merchs. Fast Motors Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997) (per curiam)). On the current record, the USOR Group has alleged claims against Plaintiffs that are not clearly excluded by the Auto Exclusion, Exclusion g.

### b. Property Damage Arising Out of the Use of an Auto

Even if the Court assumes that the USOR Group's Complaint must be construed to mean Plaintiffs used a form of an "auto" as defined in the 2011 Policy to transport materials to the USOR Site, the property damage alleged in the USOR Group's Complaint does not, under well-established Texas law, constitute property damage arising out of the "use" of an automobile.

ASIC correctly notes that the Texas Supreme Court has held that "'arise out of' means that there is simply a 'causal connection or relation[]' . . . which is

---

[87] *See* USOR Grp. Complt, at 13.

[88] *See id.* at 14.

interpreted to mean that there is but for causation, though not necessarily direct or proximate causation." *See Utica Nat. Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004) (quoting *Mid-Century Insurance Co. v. Lindsey*, 997 S.W.2d 153, 156 (Tex. 1999)). The Texas Supreme Court specified in *Lindsey*, however, that with respect to auto exclusions like that at issue here, "'the use required is of the vehicle *qua* vehicle, rather than simply as an article of property.'" *See Lincoln Gen. Ins. Co. v. Aisha's Learning Center*, 468 F.3d 857, 859 (5th Cir. 2006) (quoting *Lindsey*, 997 S.W.2d at 156). "'The term 'use' is the general catchall of the insuring clause, designed and construed to include all proper uses of the vehicle not falling within other terms of definition such as ownership an[d] maintenance.'" *Emp'r Mut. Cas. Co. v. Bonilla*, 613 F.3d 512, 517 (5th Cir. 2010) (quoting *State Farm Mut. Auto. Ins. Co. v. Pan Am. Ins. Co.,* 437 S.W.2d 542, 545 (Tex. 1969)). The *Lindsey* Court also set forth the following list of non-determinative factors to determine whether the injury arises out of the use of a vehicle:[89]

> (1) the accident must have arisen out of the inherent nature of the automobile, as such, (2) the accident must have arisen within the natural territorial limits of an automobile, and the actual use must not have terminated, (3) the automobile must not merely contribute to cause the condition which produces the

---

[89]    *Lindsey* concerned an exclusion in the context of auto liability insurance coverage. *See Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 154 (Tex. 1999). Texas law, however, illustrates that "arising out of the use of an auto" language is interpreted uniformly between the exclusion section of a CGL policy and the coverage section of an auto liability policy. *See Salcedo v. Evanston Ins. Co.*, 462 F. App'x 487, 490 n.4 (5th Cir. 2012) (per curiam) (unpublished) (comparing cases).

injury, but must itself produce the injury.[90]

*Lindsey*, 997 S.W.2d at 157 (quoting 8 *Couch on Ins.* § 119.37 (3d ed. 1997));
*accord Salcedo v. Evanston Ins. Co.*, 462 F. App'x 487, 490 (5th Cir. 2012) (per curiam) (unpublished).

Applying the *Lindsey* factors to the issue at bar, the Court concludes that the Auto Exclusion is not applicable. The USOR Group's Complaint alleges that Plaintiffs transported and/or arranged for the disposal of materials to the USOR Site.[91] Regarding the first *Lindsey* factor, though transportation of property may be a "use" of a vehicle, the alleged pollution did not *necessarily* arise out of the inherent nature of the automobile. The second *Lindsey* factor also is not met; the USOR Group's Complaint alleges nothing relevant with respect to the relationship between the alleged emissions and Plaintiffs' delivery vehicles.

The third *Lindsey* factor is whether the vehicle produced the injury. *Lindsay* involved a child who, while attempting to enter his parents' truck, inadvertently caused a loaded shotgun in the truck's gun rack to fire, injuring a passenger in another vehicle. *See Lindsey*, 997 S.W.2d at 154. The *Lindsey* court, which described this third factor as being especially troublesome because of the difficulty, under many circumstances, of determining the degree of a vehicle's involvement in the production of an injury, decided that the truck at issue in that

---

[90]    The *Lindsey* court noted that the factors did not comprise an "absolute test," *Lindsey*, 997 S.W.2d at 157–58, but rather the factors are a conceptual framework to analyze the exclusion at issue. *See Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 154 n.4; *Lancer Ins. Co. v. Garcia Holiday Tours*, 345 S.W.3d 50, 55-56 (Tex. 2011) ("Although not an absolute test, we recommended [in *Lindsey*] the following three factors as 'helpful in focusing the analysis' of the coverage question . . . ." (quoting *Lindsey*, 997 S.W.2d at 157)).

[91]    *See, e.g.*, USOR Grp. Complt, at 52, 54, 460, 462, 484-86, 491.

case "produced" the injury in part because the child set off the gun while trying to gain entry to the truck, and therefore "the truck was not merely the situs of activity . . . ." *See Lindsey*, 997 S.W.2d at 159. Likewise, in *Lincoln General Insurance Co.*, the Fifth Circuit concluded that injuries suffered by a child who was trapped in an unventilated van for several hours arose from the use of a van because the vehicle was a producing cause of the injuries. *See* 468 F.3d at 860.

In the case at bar, in contrast, the alleged property damage could have occurred regardless of the vehicles or mode of transportation used to deposit the waste to the USOR Site. The third factor is not met. ASIC fails to show that the "use of an auto" exclusion under Exclusion g precludes coverage.

### c. Does Section 2 of the Transportation Coverage Endorsement Preclude Coverage?

As noted above, every Policy, including the 2011 Policy, contains a Transportation Coverage Endorsement that amends Exclusion g, the Auto Exclusion. Section 2 of the Transportation Coverage Endorsement (the "Section 2 Exclusion") opens with the phrase "solely with respect to this endorsement," and adds a coverage exclusion for, *inter alia*, "**property damage** which occurs subsequent to the time the transported material reaches its final destination … ."[92]

The parties offer alternate interpretations of the Transportation Coverage Endorsement Section 2 exclusion. Plaintiffs argue that the phrase "solely with respect to this endorsement" limits application of the Section 2 Exclusion to the coverage established in Section 1 of the Transportation Coverage Endorsement, which itself simply modifies the coverage provided by paragraph g(6), an exception to the Auto Exclusion. Plaintiffs reason that because Exclusion g does

---

[92] *See* Transportation Coverage Endorsement to 2011-2012 CGL Policy [Doc. # 19-1], at 1, at ECF 672 (emphasis in original); *see infra* Appendix, at 47.

not apply, the Transportation Coverage Endorsement does not come into play and its Section 2 Exclusion does not bar coverage. ASIC responds that Sections 1 and 2 of the Transportation Coverage Endorsement are separate from each other, and that the Endorsement's Section 2 supplements Exclusion g by adding a new exclusion not tied to use of an auto and not tied to the exception in paragraph g(6) of the Auto Exclusion. According to ASIC, if the Section 2 Exclusion, read alone, would preclude coverage, Exclusion g precludes coverage for Plaintiffs in this case. ASIC argues that its interpretation is consistent with what it asserts is the intent of the Policies, namely, to provide coverage for accidents that occur during the course of an insured's work and to preclude coverage for pollution claims arising out of waste relinquished by the insured.

The Court finds ASIC's interpretation of the Section 2 Exclusion strained. ASIC's interpretation is inconsistent with a strict reading of Section 2's prefatory phrase "solely with respect to this Endorsement." That phrase conveys that Section 2 may be applied only within the Transportation Coverage Endorsement, and thus modifies the scope of coverage created by Section 1's exception to the Auto Exclusion (Exclusion g). Notably, ASIC's construction would make sense if Section 2 started with the introductory phrase "by this Endorsement," and read:

**AMENDMENT OF AIRCRAFT, AUTO OR WATERCRAFT EXCLUSION**
**(TRANSPORTATION COVERAGE)**

It is hereby agreed that, *by this Endorsement*, the following is added to **SECTION I., COVERAGE A. – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, paragraph **2. EXCLUSIONS**:

…[**P**]**roperty damage** which occurs subsequent to the time the transported material reaches its final destination or while it is in storage off-loaded from the conveyance which was transporting it.

Furthermore, to adopt ASIC's interpretation of "solely with respect to this endorsement" would be to render that phrase meaningless, contrary to longstanding statutory cannons of construction. Accordingly, ASIC's interpretation is not reasonable. Plaintiffs have supplied a reasonable interpretation of the scope of the Section 2 Exclusion, and the Exclusion does not enable ASIC to avoid its duty to defend in the Underlying Lawsuit.

The same result pertains even if the Court were to conclude that ASIC's interpretation of the Section 2 Exclusion is reasonable when read in the context of the Endorsement and Policy as a whole, and thus the Section 2 Exclusion is subject to more than one reasonable interpretation. Under this approach, the Policy is ambiguous to this extent. *See RSUI Indemnity Co.*, 466 S.W.3d at 130 ("To be ambiguous, both interpretations must be a reasonable interpretation of the words chosen by the parties when read in the context of the policy as a whole." (citing *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010)); *North Shore Energy L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016) (quoting *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam)).

Assuming the Transportation Coverage Endorsement and its Section 2 Exclusion are subject to more than one reasonable interpretation in this regard, the Policy as modified by that Endorsement must be construed strictly against ASIC and liberally in favor of Plaintiffs. *See Mid-Continent Cas. Co.*, 557 F.3d at 212 (citing *Barnett*, 723 S.W.2d at 666); *RSUI Indemnity Co.*, 466 S.W.3d at 118-19; *Trinity Universal Ins. Co.*, 592 F.3d at 692 (quoting *Utica Nat'l Ins. Co. of Tex.*, 141 S.W.3d at 202) ("When assessing the insurer's proffered exclusion, '[t]he court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the

insurer appears to be more reasonable or a more accurate reflection of the parties' intent.'").

Plaintiffs' interpretation of the Transportation Coverage Endorsement is reasonable. Accordingly, Plaintiffs' interpretation of the Section 2 Exclusion is adopted for the purposes of evaluating ASIC's duty to defend Plaintiffs in the Underlying Lawsuit. The Court therefore concludes that the Transportation Coverage Endorsement, including the Section 2 Exclusion, is not triggered because Exclusion g does not preclude coverage.

## V.    CONCLUSION AND ORDER

In sum, the 2011 Policy governs the determination of Defendant AIG Specialty Insurance Company's duty to defend Plaintiffs USA Environment, L.P. and Bayou City Environmental Services, L.P. in the Underlying Lawsuit. Under the 2011 Policy, the only potentially applicable exclusion is Exclusion g. ASIC has failed to show that Exclusion g precludes coverage. ASIC accordingly has a duty to defend Plaintiffs in the Underlying Lawsuit, and ASIC has breached that duty. It is therefore

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment on the Duty to Defend [Doc. # 19] is **GRANTED**. It is further

**ORDERED** that Defendant's ASIC's Cross-Motion for Partial Summary Judgment and Opposition to the USAE Motion [Doc. # 21] is **DENIED**. It is further

**ORDERED** that Defendant ASIC must defend Plaintiffs in the Underlying Lawsuit. It is further

**ORDERED** that the parties show cause on or before **July 18, 2017**, why this case should not be **stayed and administratively closed** until there is a need for a ruling on whether ASIC has an obligation to indemnify one or both Plaintiffs for

sums that the Plaintiff is legally obligated to pay because of bodily injury or property damage to which this insurance applies, as a result of a claim in the Underlying Lawsuit.

Signed at Houston, Texas, this **7**th day of **July, 2017**.


NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE

# APPENDIX OF PERTINENT POLICY PROVISIONS

This Appendix includes relevant excerpts from the insurance policies in issue in this coverage suit ("Policies"). The provisions appear in the order in which they appear in the Policies. Provisions inserted by amendment have been combined with the original language of the Policies.

The provisions presented here are taken from the 2011 Policy, though almost all are contained in all eleven Policies.

## SECTION I – COVERAGE, Coverage A. Bodily Injury and Property Damage Liability

**1.  Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies. We will have the right and duty to defend the insured against any **suit** seeking those damages. However, we will have no duty to defend the insured against any **suit** seeking damages for **bodily injury** or **property damage** to which this insurance does not apply. We may at our discretion investigate any **occurrence** and settle any **claim** or **suit** that may result…

* * * *

    **b.**    This insurance applies to **bodily injury** and **property damage** only if:

        (1)    The **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory**; and

        (2) The **bodily injury** or **property damage** occurs during the **policy period**.

**2.  Exclusions**

* * * *

    **f.**    **Pollution**

        (1)    **Bodily injury** or **property damage** arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants** at any time.

40

(2) Any **loss**, cost or expense arising out of any:

    (a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**; or

    (b) **Claim** or **suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up,  removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **pollutants**.

(3) Part (1) of this exclusion does not apply to:

    (a) **Bodily injury** or **property damage** arising out of heat, smoke or fumes from a hostile fire…

    (b) **Bodily injury** if…

(4) This exclusion does not apply to **bodily injury** or **property damage** when:

    (a) The actual or alleged discharge, dispersal,  seepage, migration, release or escape of **pollutants** arises out of **your work** and takes place at a job site where you or your subcontractors are working; and

    (b) Such job site was never at any time owned or occupied by, or rented or loaned to any insured, other than an insured which is an additional insured or qualifies as an insured under Section II, paragraph 5.

(5) This exclusion does not apply to **bodily injury** or **property damage** when the actual or alleged discharge, dispersal, seepage, migration, release or escape of **pollutants** arises out of the **products-completed operations hazard** of **your work**, as described in Section VI- DEFINITIONS, paragraph 23.

(6) With respect to paragraphs (4) and (5) of the exclusion, in determining whether **bodily injury** or **property damage** has occurred during the **policy period**, the following rules apply:

41

(a) Progressive, indivisible **bodily injury** or **property damage** over a period of days, weeks, months or longer, caused by related or continuous exposure to substantially the same general harmful conditions or substances, shall be deemed to have occurred only on the date of first exposure to such conditions or substances.

(b) However, if the date of first exposure cannot be determined, or is before the inception date of the first policy we issued to you which provides coverage substantially similar to that provided under paragraphs (4) and (5) above, but the progressive, indivisible **bodily injury** or **property damage** continues in fact to exist during this **policy period**, it will be deemed to have occurred only on the inception date of the first such Policy.

(c) An **occurrence** may result in **bodily injury** or **property damage** which occurs during the policy periods of different policies we issued to you which provide coverage substantially similar to that provided under paragraphs (4) and (5) of this exclusion. In that case, all **bodily injury** and **property damage** resulting from such **occurrence** shall be subject to the Each Occurrence Limit applicable to the first such Policy during which any of such **bodily injury** or **property damage** occurred.

(7) Parts (1) and (2) of this exclusion do not apply to **waste disposal sites**.[93]

\* \* \* \*

---

[93] Paragraph f(7) was added by the Blanket Non-Owned Disposal Sites Endorsement in the 2011-2014 Policies.

**g.    Aircraft, Auto or Watercraft**[94]

**Bodily injury** or **property damage** arising out of the ownership, maintenance, use or entrustment to others of any aircraft, **auto** or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and **loading or unloading**.

This exclusion does not apply to:

\* \* \* \*

(6)    **Bodily injury** or **property damage** within the exceptions described in sub-paragraphs (4) and (5) of Exclusion f., Pollution, of Section 1.- COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY, Paragraph 2, EXCLUSIONS, and which is caused by:

   (a)    **Loading or unloading** of any aircraft, **auto** or watercraft owned or operated by or rented or loaned to any insured; or

   (b)    Transportation of materials on the job site where you are performing **your work**.

\* \* \* \*

[**u.    Waste Disposal Site**

Any **claim** based upon or arising out of any waste or products or materials which have been delivered to a **waste disposal site**, beyond the boundaries of a site at which **your work** is being performed.][95]

\* \* \* \*

**Coverage B. Personal and Advertising Injury Liability**

\* \* \* \*

**Coverage C. Medical Payments**

\* \* \* \*

---

[94]    Exclusion g is modified by the Transportation Coverage Endorsement, which is included under all Policies and copied in full below.

[95]    This Exclusion was deleted in its entirety by the Blanket Non-Owned Disposal Sites Endorsement in the 2011-2014 Policies.

**Coverage D. Professional Liability**

* * * *


# SECTION VI - DEFINITIONS

* * * *

2.  **Auto** means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But **auto** does not include **mobile equipment**.

* * * *

18.  **Occurrence** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

* * * *

21.  **Pollutants** mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

* * * *

23.  **Products – completed operations hazard**:

   a.  Includes all **bodily injury** and **property damage** occurring away from premises you own or rent and arising out of **your product** or **your work** except:

      (1)  Products that are still in your physical possession; or

      (2)  Work that has not yet been completed or abandoned. However **your work** will be deemed completed at the earliest following times:

         (a)  When all of the work called for in your contract has been completed;

         (b)  When all of the work to be done at the job has been completed if your contract calls for work at more than one job site; or

         (c)  When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b.     Does not include **bodily injury** or **property damage** arising out of:

(1)     The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the **loading or unloading** of that vehicle by any insured …

\* \* \* \*

25.     **Property damage** means:

a.     Physical injury to or destruction of tangible property of parties other than the insured, including all resulting loss of use and diminution of value thereof. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.     Loss of use of tangible property, but not diminution of value, that is not physically injured. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it;

c.     **Natural resource damage**; or

d.     Solely with respect to coverage within the scope of paragraphs (4) and (5) of Exclusion f., Pollution, in Section I., Coverage A, 2. Exclusions, **property damage** also means those costs or expenses arising out of the testing, monitoring, clean up, removal, containment, treatment, detoxification, neutralization or other response to or assessment of the effect of **pollutants**.

\* \* \* \*

29.     **Waste Disposal Sites**[96]  means all waste treatment, waste storage or waste disposal facilities utilized by or on behalf of the Named Insured provided that such **waste disposal sites** are:

---

[96]     The Blanket Non-Owned Disposal Sites Endorsement, contained in the 2011-2014 Policies and copied below, substitutes this definition for the original "Waste disposal site" definition located in Section VI – Definitions.   The original
(continued…)

i. Properly licensed to accept and dispose of waste and in compliance with applicable federal, state, provincial or local laws …

ii. As of the Policy inception date, such facility is not listed, not proposed and has never been listed on the federal National Priorities List (Superfund), State equivalent list, or local equivalent list;

iii. As of the Policy inception date, such facility is not subject to Federal information requests under Section 104(e) of CERCLA or Section 3007(a) of RCRA or, [sic] State or Local equivalent requests; and

iv. As of the Policy inception date or date that the waste is accepted from the Named Insured, whichever is later, the **waste disposal site**, its owners and operators are not in bankruptcy or financial insolvency.

\* \* \* \*

**31.** **Your work** means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

**Your work** includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your work**; and

b. The providing of or failure to provide warnings or instructions.

\* \* \* \*

(continued…)
definition stated, "29. **Waste disposal sites** means sites utilized for the purpose of the disposal, handling, storage, processing, or treatment of any waste, whether hazardous or not and whether authorized or not."

## AMENDMENT OF AIRCRAFT, AUTO OR WATERCRAFT EXCLUSION (TRANSPORTATION COVERAGE)[97]

1.    It is hereby agreed that **SECTION I. Coverage A. – Bodily Injury and Property Damage Liability** paragraph **2. Exclusions**, subparagraph g(6) is deleted in its entirety and replaced with the following:

    (6)    … [P]**roperty damage** within the exceptions described in sub-paragraphs (4) and (5) of Exclusion f., Pollution, of SECTION 1. – COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY, Paragraph **2. EXCLUSIONS**, and which arises out of:

        (a)    **loading or unloading** of any aircraft, **auto** or watercraft owned or operated by or rented or loaned to any insured; or

        (b)    transportation of materials at, to or from any job site in the course of the performance of **your work**.

2.    It is hereby agreed that solely with respect to this endorsement, the following is added to **SECTION I., COVERAGE A. – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, paragraph **2. EXCLUSIONS**:

…[P]**roperty damage** which occurs subsequent to the time the transported material reaches its final destination or while it is in storage off-loaded from the conveyance which was transporting it.

* * * *

---

[97]    Though the Endorsement itself is included under all Policies at issue in this case, the number of this Endorsement varies among the Policies. This Endorsement is Endorsement No. 10 to the 2011 Policy.

## BLANKET NON-OWNED DISPOSAL SITES ENDORSEMENT[98]

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY AND PROFESSIONAL LIABILITY POLICY

It is hereby agreed that the policy is amended as follows:

1.     **SECTION I. Coverage A. – Bodily Injury and Property Damage Liability** paragraph **2. Exclusions**, subparagraph u. **Waste Disposal Site** is deleted in its entirety.

2.     **SECTION I. Coverage A – Bodily Injury and Property Damage Liability** paragraph **2. Exclusions**, subparagraph f. **Pollution** is amended by the addition of the following:

    (7) Parts (1) and (2) of this exclusion do not apply to **waste disposal sites**.

3. **SECTION IV. Conditions,** paragraph **2.** is amended by the addition of the following:

    1. Solely with respect to any **Occurrence, Offense, Claim** or **Suit** arising from or related to **waste disposal sites**, it is a condition precedent to coverage that we receive notice of any **claim** for **bodily injury** or **property damage** in no event more than three (3) years after the end of the policy period.

4.     **SECTION VI. Definitions** paragraph 29. is deleted in its entirety and replaced with [the definition of **Waste Disposal Sites** provided above].

---

[98]     This Endorsement is included in the 2011-2014 Policies. It is Endorsement No. 24 to the 2011 Policy.